**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| CDM CONSTRUCTORS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action File No. _____ |
| | ) | |
| RANDALL MECHANICAL | ) | |
| INCORPORATED and HARTFORD | ) | |
| FIRE INSURANCE COMPANY, | ) | **TRIAL BY JURY IS HEREBY** |
| | ) | **DEMANDED** |
| Defendants. | ) | |

## COMPLAINT

COMES NOW CDM Constructors Inc. ("CDM"), Plaintiff in the above-styled action, and files this Complaint against Randall Mechanical Incorporated ("Randall") and Hartford Fire Insurance Company ("Hartford"), showing the Court as follows:

## PARTIES

1.

CDM is a corporation incorporated in Massachusetts with its principal office located in Denver, Colorado.  CDM is thus a citizen of the states of Massachusetts and Colorado.

2.

Randall is a corporation incorporated in Florida with its principal office located in Apopka, Florida.  Randall is thus a citizen of the state of Florida.  Randall may be served with process either personally or via its registered agent, Jeffrey S. Condello, at 3307 Clarcona Road, Apopka, FL 32703.

3.

Hartford is a surety incorporated in Connecticut with its principal office located in Hartford, Connecticut.   Hartford is thus a citizen of the state of Connecticut.  Hartford may be served with process via its registered agent, CT Corporation System, at 289 S. Culver Street, Lawrenceville, GA 30046-4805.

## **JURISDICTION AND VENUE**

4.

This Court has jurisdiction pursuant to U.S.C. § 1332(a) because there is complete diversity between CDM and the above-named Defendants and the amount in controversy exceeds the sum of $75,000.00 because, *inter alia*, the monetary value to CDM of the declaratory relief CDM seeks exceeds this amount.

5.

Venue is proper in this district pursuant to 28 U.S.C. § 1391.

6.

As discussed *infra* at Paragraphs 42-47 and 56-61, there is a real, substantial and justiciable controversy between the parties concerning their respective rights and obligations.

## FACTS

### *The Savannah Harbor Expansion Project*

7.

The Savannah Harbor Expansion Project ("SHEP") is an ongoing construction project of the U.S. Army Corps of Engineers ("USACE") for the Georgia Ports Authority.  The purpose of SHEP is to deepen the Savannah Harbor shipping channel from a depth of -42 feet to -47 feet, in order to enable larger and more heavily-loaded vessels to call on the harbor with fewer tidal delays.

8.

CDM is the general contractor on the SHEP sub-project known as the SHEP Dissolved Oxygen Injection System Project (the "Project") pursuant to a contract between CDM and USACE.  The Project requires CDM to construct two dissolved oxygen injection systems at different sites: one upstream of the Savannah Harbor, at Plant McIntosh (the "Upriver Site"), and one downstream of Hutchinson Island (the "Downriver Site").  The purpose of these systems is to remove water from the river, inject it with oxygen inside twelve two-story devices called Speece cones, and return

3

the oxygenated water back to the river, in order to maintain the level of dissolved oxygen in the harbor at the pre-SHEP 47-foot deepening level and avoid or mitigate certain potential adverse environmental impacts from the Project.

9.

The dissolved oxygen injection system is a complex mechanical system, involving the work of dozens of specialized subcontractors and sub-subcontractors.

### *CDM's Subcontract with Randall*

10.

CDM entered into a subcontract with Randall, dated February 3, 2016, to perform a part of the work for the Project (the "Subcontract").  A true and correct copy of the Subcontract is attached hereto as **Exhibit 1**.

11.

Randall's scope of work,[1] per the Subcontract, was to "[p]rovide all labor, materials, and equipment to furnish and install the process piping/systems, mechanical and plumbing systems for Upriver and Downriver sites . . . . [and] Furnish Performance and Payment Bonds for the total value of this Subcontract Agreement."[2]  *See* Exhibit A to the Subcontract (Scope of Work, Schedule, Compensation, Payment and Changes in the Work).

---

[1] Randall's scope of work is more particularly described by Attachment 1 to Exhibit A to the Subcontract, and the documents referenced and incorporated therein.
[2] The listed value of the Subcontract (subject to adjustment by change orders) was $13,236,050.00.  *See* Attachment 3 to Exhibit A of the Subcontract.

12.

The Subcontract stated Randall "shall complete the Work in accordance with the schedule," and further directed Randall to "promptly submit to [CDM] a schedule pertaining to [Randall's] performance of Work under this Agreement accompanied by any and all coordination requirements with [USACE], [CDM] and other subcontractors.   [Randall's] schedule shall be subject to the review and approval of [CDM].  Such schedule shall be updated monthly or as requested by [CDM]."  *See id.*; *see also* Subcontract, Exhibit A, Attachment 2.

13.

The Subcontract required Randall to:

- "fully construct in a good, thorough and workmanlike manner in every respect all Work as specified or indicated in Exhibit A (Scope of Work) of this Agreement to the full satisfaction of [CDM]";

- "[s]upervise and direct the Work, using [Randall's] best skill and attention";

- "[a]ssure that all materials and supplies conform in quality and kind with those specified by [CDM]";

- "[e]mploy for Work hereunder personnel who possess the necessary qualifications to perform the Work"; and

- "[a]ssign to the Work and maintain at the Work site at all times that Work is in progress a competent representative to supervise its activities and receive instructions from [CDM's] representative."

*See* Subcontract, Exhibit B (Terms and Conditions) § 2.0.

14.

Per the Subcontract, Randall warranted that:

- its work would "conform with the requirements of this Agreement and with any special terms pertinent to the Work specified by CDM";

- Randall would be responsible for "the professional and technical accuracy, adequacy and standards of all Work performed under this Agreement, including but not limited to, as applicable to the Services, supervision, inspection and testing practices";

- "all Work is free from defects, incorporates the specifications, safety margins and other criteria specified for the Work, and is fit for all purposes intended"; and

- "all Work performed is free from all defects due to faulty materials or workmanship, and that the quality of material and workmanship supplied on the work by [Randall] is in full compliance with the Scope of Work attached as Exhibit A."

*See* Subcontract, Exhibit B (Terms and Conditions) § 3.0.

15.

The Subcontract stated that "[t]ime is of the essence in the performance of this Agreement.  [CDM] will schedule and coordinate [Randall's] performance of the Work with the work of others connected with the Work, and [Randall] agrees to comply strictly with such scheduling and coordination." *See* Subcontract, Exhibit B (Terms and Conditions) § 9.0.

16.

Section 12 of Exhibit B (Terms and Conditions) to the Subcontract stated, in pertinent part:

> In the event [Randall] . . . shall default in the performance of any express obligation to be performed by [Randall] under this Agreement and shall fail to correct (or if immediate correction is not possible, shall fail to commence and diligently continue action to correct) such default within ten (10) days following written notice thereof from [CDM], [CDM] may, without prejudice to any other rights or remedies [CDM] or [USACE] may have, hold in abeyance further payments to [Randall] and/or terminate this Agreement by written notice to [Randall] specifying the date of termination.  In the event of such termination by [CDM], [CDM] may take possession of and finish the Work by whatever method [CDM] may deem expedient.  If the sum of the total cost to [CDM] of completing the Work, plus all amounts previously paid to [Randall] for the Work, shall exceed the Contract Price for the Work, [Randall] shall promptly pay the difference to [CDM].

17.

The Subcontract further provided that "[l]iquidated damages will be assessed from subcontractors where applicable and reasonable," meaning that if Randall "fails to complete the work within the time specified in the contract," it "shall pay

liquidated damages to [CDM] in the amount of $10,699.81 for each calendar day of delay until the work is completed or accepted." *See* Subcontract, Exhibit C (Supplementary Terms and Conditions) § 1. Further, if "[CDM] terminates [Randall's] right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause." *Id.*

### The Performance Bond for the Project

18.

Randall, as Principal, and Hartford, as Surety, executed a Subcontract Performance Bond (Bond No. 21BCSGN6281) in favor of CDM, as Obligee, in the amount of $13,236,050 (the "Bond"). A true and correct copy of the Bond is attached hereto as **Exhibit 2**.

19.

The Bond stated that the Subcontract "is by reference made a part hereof."

20.

The Bond incorporated the entirety of the Subcontract without exception.

21.

The Bond provided that "[w]henever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:

8

(1) Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;

(2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein."

### *Randall Persistently and Repeatedly Defaulted on Its Contractual Obligations, and Failed and/or Refused to Cure Those Defaults*

22.

Randall's work on the Project was marked by delays, defective work, and other significant failures to adhere to the clear and explicit terms of the Subcontract. Randall's failure to perform per the terms of the Subcontract was habitual, and ongoing for a period of many months.

23.

Randall failed to complete its work within the timeframes specified in the Subcontract and/or as directed by CDM; failed to provide updated schedules as required by CDM per the terms of the Subcontract; failed and/or refused to perform contract work as directed by CDM; failed to supply adequate manpower to the Project to meet the schedule; failed to supply competent workers; failed to supply a competent representative to supervise Randall's Work; failed to adequately repair work that it had allowed to become damaged; and performed defective work (including work that proved to be persistently incapable of meeting required testing

protocols).   By these actions and inactions, Randall materially breached the Subcontract.

24.

Randall was given notice of and an opportunity to cure each of the defaults identified in Paragraph 23 (with a copy of such notices sent to Hartford), but Randall failed to cure its defaults within the ten-day period specified by the Subcontract (or, indeed, at all).

### *Randall's Work Was Suspended, and Randall Was Subsequently Terminated*

25.

CDM issued to Randall a Suspension Notice and Additional Declaration of Default dated January 23, 2019 (the "Suspension Notice"), a true and correct copy of which is attached hereto as **Exhibit 3**.   The Suspension Notice observed that Randall continued to be in default for, *inter alia*, failing to deliver leak-free stainless-steel piping as required by the Subcontract, and that CDM had recently discovered that several pipes were out of tolerance entering a joint (in contravention of contractual specifications).   The Suspension Notice stated that, given Randall's repeated and persistent failure to perform its work skillfully and in a workmanlike manner, "CDM has lost all confidence in Randall's ability to perform."

26.

The Suspension Notice went on to state that "Randall is hereby directed to

**SUSPEND THE WORK[3] effective as of the date of this letter January 23, 2019**

and ending upon Randall's Surety response to a contemporaneous demand that the

Surety step in, hire a competent mechanical contractor, and perform the balance of

Randall's obligations under the Subcontract."

27.

Contemporaneously, CDM (via letter dated January 23, 2019 (the "Demand

Letter"), a copy of which is attached hereto as **Exhibit 4**) made a demand on

Hartford to perform under the Bond.  CDM briefly recounted many of Randall's

numerous past and present defaults.  CDM stated that "[i]t is clear that Randall is

not capable of curing its deficiencies after many opportunities to do so," and

demanded that "the Surety IMMEDIATELY step in and perform and advise CDM

if it intends to proceed under options (1) or (2) under the Bond (which contemplate,

respectively, (i) performance by the Surety or (ii) performance by CDM, with the

reasonable cost of performance to be borne by the Surety to the extent it exceeds the

balance of the subcontract price.)"

28.

The Demand Letter gave Hartford a seven-day period in which to decide how

it planned to perform its obligations under the Bond (a period that coincided with

---

[3] Per Section 10 of Exhibit B (Terms and Conditions) to the Subcontract, CDM may by written notice suspend further performance of Randall's work for a specified period.

11

the period during which Randall was directed to suspend its Work).

29.

The Hartford failed to tender performance under the Bond within the seven-day period specified in the Demand Letter and gave CDM no assurance that it intended to do so.

30.

On or about February 1, 2019, CDM terminated Randall in light of its continued failure and/or refusal to cure its many significant defaults.

### *The Hartford Refused to Tender Adequate Performance Under the Bond*

31.

By letter dated February 18, 2019, counsel for Hartford informed counsel for CDM that Hartford would perform under the Bond by having Randall complete the work, using both its own workers and two employees of another mechanical contractor, with "periodic[]" supervision provided by a representative of Forcon International, a surety consulting and forensic engineering company.  A true and correct copy of this letter is attached hereto as **Exhibit 5**.

32.

Hartford's performance offer was in fact not an offer to perform for the following reasons:

(a) Performance was to be bid by Randall who had persistently refused and failed to perform;

(b) Hartford offered no information regarding how Randall would successfully repair piping that it was incapable of repairing for many months prior; and

(c) Hartford suggested utilizing the same work crews that had incompetently installed the defective work in the first instance.

### *CDM Has Sustained Damage*

33.

CDM has been forced to supplement the forces of Randall and replace the forces of Randall.

34.

CDM has spent in excess of $75,000 in supplementing, curing and completing the work of Randall.

35.

Randall disputes some or all of the costs spent and sustained by CDM.

36.

CDM continues to sustain costs and damages.

## <u>COUNT I – BREACH OF CONTRACT (RANDALL)</u>

### 37.

Plaintiff hereby realleges and incorporates Paragraphs 7-36 referenced above.

### 38.

The Subcontract is a valid and binding contract for consideration (performance by Randall; payment for that performance by CDM), executed by representatives of both Randall and CDM.

### 39.

Randall breached the Subcontract by failing to complete its work within the timeframes specified in the Subcontract and/or as directed by CDM[4]; failing to provide updated schedules as required by CDM per the terms of the Subcontract[5]; failing and/or refusing to perform contract work as directed by CDM[6]; failing to supply adequate manpower to the job to meet the schedule[7]; failing to supply competent workers[8]; failing to supply a competent representative to supervise its Work[9]; failing to adequately repair work that it had allowed to become damaged[10];

---

[4] *See* Exhibit A to the Subcontract (Scope of Work, Schedule, Compensation, Payment and Changes in the Work).
[5] *See id.*
[6] *See* Subcontract, Exhibit B (Terms and Conditions) § 9.0.
[7] *See* Exhibit A to the Subcontract (Scope of Work, Schedule, Compensation, Payment and Changes in the Work).
[8] *See* Subcontract, Exhibit B (Terms and Conditions) § 2.0.
[9] *See id.*
[10] *See* Subcontract, Exhibit B (Terms and Conditions) §§ 2.0, 3.0.

and performing defective work (including work that proved to be persistently incapable of meeting required testing protocols).[11]

40.

As a result of Randall's various material breaches, CDM has suffered (and continues to suffer) damages in an amount to be proven at trial, including liquidated damages due to Randall's failure to timely complete its work and costs incurred in supplementing, curing, and completing Randall's work (on which CDM has spent in excess of $75,000).

41.

CDM has fully performed its obligations under the Subcontract and has performed all relevant conditions precedent (or such conditions have otherwise occurred or been waived), including all conditions precedent to filing suit.

## COUNT II – DECLARATORY JUDGMENT (RANDALL)

42.

Plaintiff hereby realleges and incorporates Paragraphs 7-36 referenced above.

43.

CDM, following notice and the contractually-required opportunity to cure, terminated Randall pursuant to Section 12 of Exhibit B (Terms and Conditions) for

---

[11] *See id.*

its failure to remedy the defaults described in Paragraphs 22-27 (and the exhibits referenced therein) *supra*.

44.

CDM contends that it had sufficient cause to terminate Randall, and that its termination of Randall was otherwise proper.  Randall has repeatedly asserted that CDM's termination of Randall was baseless and improper and has stated that it intends to contest the termination.  Thus there is thus an actual controversy between the parties, which have adverse legal interests.

45.

Randall's repeatedly-articulated position that it was improperly terminated is creating immediate and continuing legal uncertainty for CDM.  In particular, uncertainty regarding the propriety of CDM's termination creates a real and immediate risk that CDM, in attempting to cure Randall's defaults, remedy Randall's defective work, and complete the performance of Randall's obligations, will take actions that will later be found to be in breach of the Subcontract and cause CDM to incur damages, or to expend funds that it will not be able to recoup from Randall if it is determined that the termination was improper.

46.

Accordingly, CDM requests this Court declare that CDM had sufficient cause to terminate Randall from the Project and that its termination of Randall pursuant to

the terms of the Subcontract was otherwise proper.

47.

CDM has performed all conditions precedent to this claim for declaratory relief (or such conditions have otherwise occurred or been waived), including all conditions precedent to filing suit.

### COUNT III – BREACH OF CONTRACT (PERFORMANCE BOND) (HARTFORD)

48.

Plaintiff hereby realleges and incorporates Paragraphs 7-36 referenced above.

49.

The Bond is a valid, binding contract supported by consideration and executed by Randall and Hartford.

50.

The Bond was executed for CDM's benefit and CDM, as Obligee under the Bond, is a third-party beneficiary with the right to enforce the Bond's terms.

51.

CDM provided Hartford with reasonably contemporaneous notification that various actions and inactions of Randall were in default and breach of its Subcontract obligations, and that Randall was failing/refusing to cure those defaults.

52.

CDM provided Hartford with timely and otherwise compliant notice that it was suspending Randall's work (as well as the reasons for that suspension), that it was making a declaration of default under the Bond; and CDM properly and timely demanded that Hartford remedy Randall's default.

53.

Hartford breached the terms of the Bond by—in response to CDM's declaration of default and demand under the Bond—tendering performance by Randall to cure Randall's own persistent and habitual defaults under the Subcontract. Hartford's performance offer was in fact not an offer to perform for among the following reasons:

(a) Performance was to be bid by Randall who had persistently refused and failed to perform;

(b) Hartford offered no information regarding how Randall would successfully repair piping that it was incapable of repairing for many months prior; and

(c) Hartford suggested utilizing the same work crews that had incompetently installed the defective work in the first instance.

54.

As a result of Hartford's breach of the Bond, CDM has suffered (and continues to suffer) damages in an amount to be proven at trial, including costs incurred in supplementing, curing, and completing Randall's work, increased CDM costs and potential liquidated damages, which CDM incurred due to Hartford's failure and refusal to tender adequate performance under the Bond.  Such damages exceed $75,000.

55.

CDM has fully performed its obligations under the Bond and has performed all relevant conditions precedent (or such conditions have otherwise occurred or been waived), including all conditions precedent to filing suit.

WHEREFORE CDM respectfully requests that the Court:

(a) Award CDM damages in an amount to be proven at trial on its breach of contract claim against Randall;

(b) Declare that CDM had cause to terminate Randall, and that the termination was otherwise proper;

(c) Award CDM damages in an amount to be proven at trial on its breach of contract claim against Hartford; and

(d) Grant CDM such other and further relief as it may deem just and proper.

Respectfully submitted, this 13th day of March 2019.

                              **HUDSON PARROTT WALKER, LLC**

                              /s/ Brad C. Parrott
                              Brad C. Parrott
                              Georgia Bar No. 595999
                              bparrott@hpwlegal.com
                              Zachary R. Hall Georgia Bar No. 397354
                              zhall@hpwlegal.com

                              Fifteen Piedmont Center, Suite 850
                              3575 Piedmont Road, NE
                              Atlanta, Georgia 30305
                              Telephone:  (404) 554-8181
                              Facsimile:  (404) 554-8171
                              *Attorneys for CDM Constructors Inc.*

20

## **LR 7.1 CERTIFICATE**

Pursuant to L.R. 7.1D, counsel certifies that the foregoing complies with the font and point selections approved by the Court in L.R. 5.1C.  This document was prepared using Times New Roman 14 point font.

/s/ Brad C. Parrott
Brad C. Parrott
Georgia Bar No. 595999